## McDOWELL et al. v. SECURITY UNION INS. CO. (No. 2184.)

Court of Civil Appeals of Texas. El Paso. Nov. 8, 1928.

White & Yarborough, of Dallas, for appellants.

Touchstone, Wight, Gormley & Price, of Dallas, for appellee.

WALTHALL, J. Mrs. Sophie Dalton, a feme sole, individually, and as next friend of Dalton McDowell, Maxine McDowell, and C. D. McDowell, her minor children, brought this suit against the Security Union Insurance Company, under the Workmen's Compensation Act of this state to set aside the final ruling and decision rendered by the Industrial Accident Board and to recover compensation by reason of the death of J. H. McDowell, her husband, and the minors' father, alleged to be his sole and only beneficiaries.

On and for several years prior to the 26th and 27th days of January, 1927, J. H. Mc-

Dowell was an employee of the Trinity Portland Cement Company, in Dallas, Tex., a subscriber under said act. It is alleged that on the said 27th day of January, 1927, J. H. McDowell sustained accidental personal injuries while in the employ of said company and in the course of his employment, which injuries resulted in his death about five days later.

Appellee admitted in open court on the trial that appellants filed notices of the alleged injury to McDowell and their claim for compensation with the board within the time required; gave notice to the board and the Trinity Portland Cement Company within the time required of their refusal to be bound by the award of the board; that appellee had notice of plaintiff's appeal; that suit was duly filed and notice given; that appellee had issued compensation insurance policy, and it was in force on the 26th and 27th days of January, 1927; and that the premium thereon had been paid.

Appellee insurance company answered by general and several special exceptions, general denial; specially denied that J. H. McDowell ever sustained any accidental personal injuries in the course of his employment with the Trinity Portland Cement Company; alleged that, while J. H. McDowell was working for Dallas Power & Light Company, on October 17, 1921, he sustained serious and permanent injuries, and in particular to his head, for which he received compensation, and that his death, on the occasion in question, was a result of that accident and not caused or contributed to by any injury received when working for Trinity Portland Cement Company, and in the course of his employment. The court sustained a number of special exceptions to appellants' petition to which they excepted.

The case was tried to a jury, the evidence heard, and at its conclusion the court instructed a verdict for appellee.

## Opinion.

It is submitted here that the evidence heard on the trial was sufficient to take the case to the jury on the issue of accidental personal injury to J. H. McDowell, resulting in his death while in the course of his employment as an employee of the Trinity Portland Cement Company.

The evidence shows without question that on the 26th and 27th days of January, 1927, and for about four years next preceding that time, J. H. McDowell was an employee of the Trinity Portland Cement Company, and that, from about 6 o'clock of the evening of the 26th, until about 1 o'clock of the morning of the 27th of January, J. H. McDowell was working at his employment in appellee's power house. He was on the night shift. The night shift works thirteen hours seven days in the week. He worked practically every night. Some witnesses who worked at the same plant and knew him well testified. They said: "He appeared (at the time in question) to be in good health;" "a pretty stout fellow;" "his physical condition the last three or four years appeared to me to be good;" "he seemed to be strong;" "he worked like he was strong." On the night of the 26th J. H. McDowell went to work in the power house at 6 o'clock.

Extracts from the evidence of different witnesses show:

"He was taking some asbestos off some pieces of pipe. He was working on some pipe. About four pieces of pipe about ten feet long. The pipe was laying on the floor. No, that was not all that was in that room. * * * This room is not a room by itself, it is one big building. * * * He had four pieces of pipe taking the asbestos off of this pipe, and the pipe was lying on the floor. He would have to bend over a little bit in doing that work; the pipe was on what they called horses about that high (indicating), one piece of pipe up there at a time. This pipe was about ten feet long and three inches in diameter. * * * He had one piece of pipe at a time on these horses. * * * I saw him (McDowell) last shortly before one o'clock; at that time he was going down the aisle; he did not have his hat on; he had on a jumper; it was cold that night. * * * I don't know where he went; I don't think I ever saw him with his hat off before that; A. D. Adair was foreman of the job that night; the men on the job, when they leave their work, are supposed to notify where they are going. * * * I was not working with him; I helped him put this pipe up on the horses; * * * I don't know whether I helped him put up all four pieces of the pipe or not; I helped him put some of them up; * * * There are switchboards and equipment in that power house; yes, sir, all in there at the time he was working in there, in and around his place. Yes, sir, the boilers were in there. The electric plant was in there, electric appliances. No, sir, there were no dynamos in there, motors though. There were engines in there too. Yes, sir, that was running that night. * * * We (witness and Smith) discussed him going out. I saw him go by, I didn't know what to think about it; I guess I thought it was strange and that was what we talked about. Yes, I guess it was by his strange acts that attracted our attention to him. Ordinarily I don't think I would have paid any attention to him if it wasn't for his strange actions, what he was doing at that time. That was an unusual course. * * * I don't think I would have paid any attention to him if he had been going out looking like a normal man. His acts, his doings that night, at that particular time, was so strange that it called my attention to it. * * * Mr. Smith and I were sitting there together when he called my attention to this boy going out. We, including Mr. McDowell, were working for the Trinity Portland Cement Company at that time. * * * I saw him I guess an hour after that at a distance. No, sir, I did not go out and help look for him, I had to stay inside. I think they did go after him but I don't know. * * * No, sir, I did not see the blood on his face when he was going out there. If there had been any blood on his face I believe I would have seen it. I had a side

view of him. He was walking east and I was south. He looked straight to the front when he was going out. He did not say anything to me. Yes, when he came back I saw blood on his face. * * * No, I didn't see any blood on his face. No, sir, not on his forehead. * * * I didn't get close enough to notice a bruised place on the top of his forehead. Yes, I knew and realized and he appeared to me that night when he started off there was something wrong, that is what made you notice it when it appeared to me something was wrong."

### W. C. McDowell testified:

"I was working there at the Trinity Portland Cement Company the night he (J. H. McDowell) was killed. * * * The first I knew anything about this was about one o'clock when I was notified. Ike Reagan notified me. * * * My brother, J. H. McDowell, was in the power house the first I saw of him. He was at the south door, south side of the room of the Trinity Portland Cement Company. At that time he was sitting down in a chair with a scar over his eye along about here and about there, a little further up in his hair. There was blood. * * * I talked with my brother at that time. I looked at his forehead. It was on the left temple. The scar was three quarters of an inch or a little longer. I couldn't tell how deep it was, it was bloody over it, you know. He was, in a way, mentally conscious, but he didn't seem to know much, didn't seem to know what happened, wasn't at hisself, you might say, at all. * * * He appeared to be suffering pain, looked awful bad, and he was awful bad, and he was awful sick, wanted to get in a draft and when he would get in it he would want to get out, wanted to get fresh air. * * * He looked awful pale. * * * Yes, he appeared to me to be hurt, looked like, I don't know what you would call it, that scar over his eye and getting sick like that, got a blow on the head. * * * He worked on the boilers and such as that in the building of flues in the boilers and blowing out the flues if they had clinkers in them. * * * There was a plank floor up around where he had to blow the flues. * * * We took him home. * * * It was a two seat car. * * * He was able to sit up riding home. He would lean back of course. He was at his right mind but all the same couldn't remember all that had happened to him. * * * After that he lived five days. * * * He seemed to be suffering pain, * * * would rub his head, * * * was conscious most of the time, * * * appeared to grow stronger, * * * just lingered along, * * * was up, I suppose every day, and would lay around. * * * His physical condition was good, extra good, I think, before this night. * * * He had a scar about three quarters of an inch long, something like that; * * * Yes, I pushed his hair back and looked at the gash there, * * * there was blood running out; wiped off the blood come down here on his face. * * * I remember the time my brother was injured several years ago. * * * I don't remember the nature of his injury. He was hurt pretty bad at that time. He laid off work at that time for a year or more. * * * He got well."

### George McDowell testified (is a brother of J. H. McDowell):

"My brother had received an injury previous to that to his head and laid off on account of that injury something like a year. * * * Yes, he seemed to recover from that and gone back to work. * * * The injury he received (was) to his head."

### W. M. Smith testified:

"I saw Mr. McDowell go out like he was quitting work. * * * I noticed that he did not have on any hat, * * * a jumper is all that he had on. * * * He was acting sleepy or something; I couldn't say he walked like anything was the matter with him, walking with his (head) kind of down, walked right by the boiler. * * * He never returned to his work for about an hour."

### Mrs. Sophia McDowell, one of plaintiffs, testified:

"I am the wife of J. H. McDowell. * * * He died on the 2nd of February, 1927, * * * When my husband came in I noticed something unusual about him. * * * he did not look like he did in the evening when he left to go to work. I noticed a place hurt on his head, on his temple had blood on it. * * * I asked him how did he get hurt. Yes, sir, he answered that question, * * * at that time he appeared to me to be suffering great pain; it was ten minutes after that (he arrived home) before I had that conversation with him; (the court excluded his answer) * * * he would get better at times and worse at times."

Frank Owens testified before the board and by agreement his evidence was read on the trial. He said:

"I knew Mr. J. H. McDowell. Well, I worked with him somewhere near two years. I believe he was hurt over there on the morning of the 27th; * * * his regular job was blowing the flues; * * * the night he was hurt over there I noticed a minor scratch there in his left temple. Sure, I saw the place on his left temple; * * * Mr. McDowell sustained his injury to his left temple somewhere about one o'clock. * * * apparently he was all right when he came to work. * * * Mr. Adair just made some remark as to keeping an eye on McDowell. Well, he said he was a little off, I believe he said. * * * I noticed him walk down the aisle in the power house. Well, he seemed to be unbalanced, you might say. * * * It seemed as though he didn't have normal control of himself. * * * He left without his hat and left wearing a jumper. * * * After he left the power house the man I told to go look for him, came back and reported that he could not be found. * * * They went out in couples and then made a big search for him over the plant, * * * they looked about an hour, * * * they didn't find him. * * * Mr. McDowell came back to the power house at about ten minutes after two. * * * I first saw him coming down the aisle staggering. I let him walk down the aisle a piece and then called him, * * * he did seem to be kind of off, * * * in a dazed condition; * * * he came up the stair-steps to where I was working. I spoke first; I says, 'where have you been?' He says, 'I don't know.' Them fellows had carried him up the railroad tracks and he had walked about five miles straight down the track. * * *

I asked him what was the matter with his left hand. His left hand was scratched and there was a little bruise over his left temple and he said he had fallen down. He didn't say where, he said he just fell down. He didn't say where he first became conscious and knew where he was. * * * After that conversation he told me (he) wanted to go back down stairs. He said he felt fainty and dizzy."

Dr. E. J. Brooks testified (is a physician, knows McDowell):

"I treated him immediately before his death. I saw him soon after midnight on January 27th, * * * he was in the emergency at the plant, sitting in a chair, dressed, was nervous, said he was walking four or five miles, some slight abrasions on his forehead, I believe on the left side, slight injury on his hand. * * * I sent him home. I made an examination especially. When I first examined his tongue it was sore, showed he had chewed his tongue or bitten his tongue. That is a symptom usually that occurs at time of convulsions. It might be any kind as epileptic. Mr. McDowell died February 2nd after midnight. Yes, sir, the first time I saw him he was sitting up dressed. His clothes were dirty, indicating he had been on the ground. Yes, not concrete, but dirt. I saw him once at home subsequent to January 27th, and prior to his death; at time he was sitting up in a chair dressed. Apparently he was in a better condition than when I first saw him; he complained of a headache this time, was his chief complaint. * * * From my experience as a physician, he was suffering at that time (two or three hours before his death) from cerebral trouble. There was an autopsy performed after his death. I was present when it was performed and observed what was found. Gross appearance, there was nothing found to cause his death."

Question: "Was there anything to account for his death?"

Answer: "Necrosis of the brain condition. The doctor that performed the autopsy said that the necrosis was chronic. I did not examine the necrosis microscopically. In my opinion this cut (had) absolutely nothing to do with his subsequent death. The injury on his hand did not have anything to do with it."

The burden of proof was on appellants to show that the death of J. H. McDowell was caused from personal injuries sustained by him in the course of his employment. The injury so received must have to do with and originate in the work, business, trade, or profession of McDowell, received by him while he was engaged in or about the furtherance of the affairs or business of the Trinity Portland Cement Company, whether upon its premises or elsewhere. Article 8306, R. C. S. 1925; part 4, art. 8309, R. C. S. 1925, defining the term "injury sustained in the course of employment." Lumberman's Reciprocal Association v. Behnken, 112 Tex. 103, 246 S. W. 72; Texas Employers' Insurance Association v. Bailey (Tex. Civ. App.) 266 S. W. 192 (writ refused).

We have concluded that the evidence from which we have quoted so extensively does not show that appellants have discharged that burden. The evidence goes to show that on some previous occasion several years past McDowell had received some injury to his head, but from which injury he had apparently recovered. At the time of the supposed injury, here, and before its occurrence, McDowell was acting strangely, his movements were being watched by the foreman and others on the work. Without any apparent reason, and acting rather strangely, but not shown to be then injured, he left the building where he was employed, was gone about one hour, not on anything connected with his employment, voluntarily returned in a dazed condition, no explanation of his absence (except some incoherent statement of an improbable occurrence), said he had fallen down but not when or where, was taken home, and died some five days thereafter. It is not shown by the remotest evidence that McDowell's injury from which he died was received by him "in the course of his employment." If it be conceded, which the evidence does not show, that he fell down in the building and in the course of his employment, it would be but a presumption, sufficient, possibly, to take the issue to the jury, that his death was superinduced by or resulted from his fall. But, in the absence of any evidence that McDowell fell in the building or while in the course of his employment, the conclusion therefrom that the abrasion or hurt on his forehead caused his death would be but a presumption from a presumption, which the law does not permit.

There is no suggestion in the evidence other than that of Dr. E. J. Brooks, who attended him, as to the character or extent of the injury received in his fall, or where it occurred. The injury is described by the doctor after an examination as "a slight abrasion on his forehead." After an examination and observation of McDowell during the days he lived, and after an autopsy had been performed after his death, at which Dr. Brooks was present and observed what was found, the doctor states that the abrasion on his forehead had absolutely nothing to do with his subsequent death, and that chronic necrosis of the brain condition accounted for his death, stating conditions he observed before and after the autopsy from which he stated his professional opinion as above.

It was not reversible error to sustain an exception to that part of appellants' petition in which it was alleged that appellee insurance company in its report to the Industrial Accident Board admitted and assumed liability, as such fact, if it was a fact, could be shown without such allegation.

It was not error to refuse to permit Mrs. Sophia McDowell to state what her husband said to her after he arrived at home some two hours or more after he was seen to leave the power house, as to when and where

he fell and received the injury on his temple. Any statement he would then make would not be admitted as original evidence under the rules of res gestæ. Lumbermen's Reciprocal Ass'n v. Adcock (Tex. Civ. App.) 244 S. W. 645, in which Judge Hightower for the Beaumont court discusses the rule and refers to many Texas cases sustaining his conclusion. We refer to that case and the cases used as stating the Texas rule.

Appellants submit that a new trial should have been granted on the ground of newly discovered evidence. It is said in the motion that Dr. Goforth held an autopsy on the body of McDowell and would testify that his death was the result of injuries to his head, and that appellants did not know and could not know to what Dr. Goforth would testify until after the trial, and stating when and how the information came to appellants as to the newly discovered evidence, and the diligence used.

Dr. Brooks, however, testified that the autopsy was had under the consent of Mrs. McDowell and one of the McDowell brothers. They knew several months before the trial that the autopsy was held, and the trial court evidently concluded either that diligence was not used, or that the stated newly discovered evidence, if admitted, would not be sufficient to change the result. The newly discovered evidence would not tend to show that the recent injury to McDowell's head was received in or about the power plant, or in the course of his employment, which must be made to appear; the other evidence not showing that material fact.

The view we take of the case renders it unnecessary to discuss the other propositions.

Finding no reversible error, the case is affirmed.