PANHANDLE & S. F. RY. CO. v. HUCKA-
BEE et ux. (No. 1436.)

(Court of Civil Appeals of Texas. Amarillo.
Dec. 11, 1918.)

1. EVIDENCE ⚖➝126(1)—RES GESTÆ—CAUSE OF INJURY.

Declarations made by one who has suffered injuries, as to how the accident happened, are admissible as res gestæ when made under stress of nervous excitement which stills the reflective faculties, and the time between the accident and declaration is so brief that it must be assumed a consideration of self-interest could not have been brought fully to bear by seasoned reflection (citing Words and Phrases, First and Second Series, Res Gestæ).

2. EVIDENCE ⚖➝126(1)—RES GESTÆ—SPON-
TANEITY.

The question, whether the circumstances show such spontaneity as to render a declaration of an injured person as to how the acci-

dent happened admissible as part of the res gestæ, rests largely in the discretion of the trial court; but the facts and evidence should be sufficient to justify the reasonable conclusion that the declaration was made under such conditions as that it might be said the reflective faculties were not dominant.

3. EVIDENCE ⚖➝126(2)—ADMISSIBILITY—RES GESTÆ.

A declaration made by deceased to his father about 1½ hours after the occurrence of the fatal accident, as to how it occurred, in which decedent explained that one of the standards holding his load of lumber broke in crossing railroad tracks and caused his team to run away, held not admissible as part of the res gestæ.

4. JURY ⚖➝28(6)—JURY TRIAL—WAIVER.

Notwithstanding Rev. St. 1911, art. 4704, relating to the assessment of damages in death actions, the court, under article 1985, may, in a death action submitted on special issues, determine the question of the amount of damages, on the ground that jury trial was waived, where the only special issue submitted or requested on the question of damages, was to the yearly earnings of deceased.

5. DEATH ⚖➝99(5)—ACTION—DAMAGES.

Parents are entitled to recover only compensation for the services and contribution which they might reasonably have expected from a son of 23, and, where they were not in need of the financial aid of the son, though he was at home and devoted all his time to their service, an award of $3,500 was excessive.

Appeal from District Court, Floyd County; R. C. Joiner, Judge.

Action by W. A. Huckabee and wife against the Panhandle & Santa Fé Railway Company. From a judgment for plaintiffs, defendant appeals. Reversed and remanded.

Madden, Trulove, Ryburn & Pipkin, of Amarillo, for appellant.

T. F. Houghton, of Floydada, for appellees.

BOYCE, J. This suit was brought by appellants, W. A. Huckabee and wife, against appellant railway company, for damages on account of the death of their son, Wesley Huckabee, a young man 23 years old, and living with his parents at the time of his death. The petition alleged that the appellant company negligently constructed and maintained a certain crossing of a public road over its tracks, in the town of Floydada; that the said Wesley Huckabee drove a wagon loaded with lumber onto said crossing, and on account of the swaying and jolting of the wagon, caused by the rough condition of said crossing, one of the standards which retained the lumber on the wagon broke so that part of the lumber fell off, which frightened the team and caused them to run away; that the said Wesley Huckabee fell under the wagon, was run over, and sustained the in-

juries from which he died. We will make such statement of facts as are necessary in the discussion of the assignments.

[1-3] It is undisputed that such an accident did occur at or near the crossing, as stated, though it was in issue as to whether this was the result of the condition of the crossing. As a material part of the evidence tending to establish the fact that the accident was caused by the condition of the crossing, the father, W. A. Huckabee, was permitted to testify that when he reached the bedside of his son, about 1½ hours after the accident, he asked his son how the accident happened, and that—

"He told me in crossing the first track on the railroad here, he said when the left hind wheel dropped off the second rail, the front standard broke, and the lumber slid off, and that scared the mules, and he tried and he couldn't hold them, and he said, either that the mules knocked him under it or the lumber knocked him under the wagon, and he didn't know which, and then the wagon ran over him, and, of course, the mules went on."

It is urged that this testimony was inadmissible as being hearsay and not part of the res gestæ. In order to determine whether this objection is well taken, it is necessary to set out the facts surrounding the accident and transpiring in the interim intervening up to the time when the statement was made. Several persons arrived at the scene of the accident within a very short space of time thereafter. Wesley Huckabee was then conscious, stated that he was "broke all to pieces," and asked some of those present to notify his parents. At this time he stated that "the standard broke, and I thought I could hold them, but stumbled over a bunch of shingles and fell," no statement being made as to the cause of the standard breaking. A physician soon arrived, and he was taken to a sanitarium in the town, and said physician testified that—

He "found a simple fracture of the thigh. We straightened them out and put on a modified Buck's extension, and put him to bed. He was not complaining of any other injuries then."

The family lived about 8½ miles in the country, and the father reached the sanitarium in about 1½ hours, whereupon the statement above referred to was made. No other evidence was offered as to the mental or physical condition of the said Wesley Huckabee between the time of the accident and up to the time the statement was made, nor is it shown whether he was suffering much pain, and what, if anything, had been done to alleviate it. Neither does it appear whether this conversation with the father occurred before or after the physician had completed his operations in caring for the fractured thigh. Some time after, just when does not appear clearly from the evidence, it was discovered that the said Wesley Huckabee was in a stupor, in which condition he remained for 86 hours, when he died. The physician stated that the stupor and death were the result of concussion of the brain, but that he "did not make any examination of the head of the deceased; he was not complaining of anything at all wrong with his head, and I just did not think of it."

The testimony referred to would, of course, ordinarily be considered as hearsay, and the party offering it ought to make it reasonably appear that it came within some of the exceptions to the general rule against hearsay testimony before it would be admissible. It is claimed in behalf of its admission here that it is a part of the res gestæ, and for this reason admissible. Much has been written on this subject. Bouvier's Law Dictionary, "Res Gestæ"; Words and Phrases, Original and Supplemental Editions, "Res Gestæ"; Greenleaf on Evidence, §§ 108 to 114; Wigmore on Evidence, 1745 to 1757; R. C. L. vol. 10, pp. 987–989. We had occasion recently, in the case of Dallas Hotel Co. v. Fox, 196 S. W. 652, to consider a question very similar to the one now before us, and full citation of the Texas authorities will be found in the opinion in that case. One of the most satisfactory statements of the rule, the reasons therefor, and the test to be applied to determine whether a particular case comes within it, as applicable to the present case, is to be found in Wigmore on Evidence. Declarations of the kind we are considering are treated by this author as genuine exceptions to the hearsay rule (section 1746), and, as the writer does not feel that he can improve the statement made by Prof. Wigmore, we here quote it as being a fair statement of this phase of the law:

"This general principle (of the exception) is based on the experience that under certain external circumstances of physical shock a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses and during the brief period when consideration of self-interest could not be brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him, and may therefore be received as testimony to those facts."

Section 1747: " * * * This principle is represented in the present exception by the phrase oft repeated that the statement must, from the circumstances, 'derive a degree of credit independently of the declaration'; that is, other than the faith to be given to an ordinary extrajudicial assertion. This circumstantial guaranty here consists in the consideration already noted that in the stress of nervous ex-

citement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief. The utterance, it is commonly said, must be 'spontaneous,' 'natural,' 'impulsive,' 'instinctive,' 'generated by an . excited feeling which extends without let or breakdown, from the moment of the event they illustrate.' "

Section 1749: " * * * There must be some shock, startling enough to produce this nervous excitement, and render the utterance spontaneous and unreflecting. * * * ' The utterance must have been before there has been time to contrive and misrepresent; that is, while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. * * * It is to be observed that the statements need not be strictly contemporaneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. Furthermore, there can be no definite and fixed limit of time; each case must depend upon its own circumstances."

In section 1750 the author quotes from numerous authorities in support of his statement of the rule. One of the quotations, which he states as the "most satisfactory exposition" of this rule, is taken from the case of Travelers' Insurance Company v. Sheppard, 85 Ga. 776, 12 S. E. 27, and is as follows:

"There must be no fair opportunity for the will of the speaker to mold or modify them. His will must have become and remained dormant, so far as any deliberation in concocting matter for speech or selecting words is concerned. Moreover, his speech, besides being in the present time of the transaction, must be in the presence of it in respect to space. He must be on or near the scene of action or of some material part of the action. His declarations must be the utterances of human nature, of the genus homo, rather than of the individual. Only an oath can guarantee individual veracity. But spontaneous impulse may be a sufficient sanction for the speech of man as such—man distinguished from this or that particular man. True, the verbal deliverance in each instance is that of an individual person. But if the state of his mind be such that his individuality is for the time being suppressed and silenced, so that he utters the voice of humanity rather than of himself, what he says is regarded by the law as in some degree trustworthy. * * * What the law altogether distrusts is not after-speech but after-thought. That the declarations shall be or appear to be spontaneous is indispensable, and it is for this reason alone that they are required to be speedy."

Practically all of the authorities agree that the decision of the question as to whether the circumstances show that that spontaneity required by the rule exists rests very largely in the discretion of the trial court. However, the facts and evidence ought to be sufficient to justify the reasonable conclusion that the declarations were made under such circumstances and conditions as that it might be said that reflection and reason were not dominant, rather than the unreasoning impulse necessary to guarantee them. The evidence here does not seem to us to be sufficient in this respect. The young man was conscious immediately after the injury and did not appear to be laboring under an extraordinary degree of excitement or nervousness. As we have already stated, the record is silent as to his condition from this time until the time when the declarations were made, about 1½ hours later. He was only complaining of his thigh. He may or may not have been given something to alleviate his pain. Evidently, there was nothing unusual in his condition, as the physician did not suspect that he had sustained any other injury. We suppose, also, that he was conscious during all of this time. Under these circumstances, we do not think the courts have the right to presume that the mental condition of the young man was such 1½ or 2 hours after the accident as to bring his declaration within the rule announced by the authorities. We therefore sustain the seventh assignment of error.

[4] The case was submitted to the jury on special issues. The only special issue submitted on the question of damages was the following: "On the date of deceased's death, what were his yearly earnings which would have been contributed to plaintiffs?" To which the answer was: "We answer net $250." The court entered judgment for plaintiffs for $3,500, and it is complained that this judgment is for an amount not found by the jury, and that in this character of case the amount recovered under the provisions of article 4704, Rev. St., must be assessed by the jury and not by the court. It is true that the amount of the damages cannot be determined from the verdict of the jury without taking into consideration many other uncertain elements which the appellant had the right, upon seasonable insistence, to have the jury pass on. No request for the submission of any other special issue was made by the appellant, and, if the case is to be determined by the law and rules of general practice, this failure to request the submission of such special issues as to the amount of damages recoverable was tantamount to a waiver of the right of trial by a jury as to such issue, and agreement that the same might be determined by the court from the evidence. Rev. St. art. 1985; Moore v. Pierson, 100 Tex. 113, 94 S. W. 1132. We do not think that it was the intention of the Legislature, in the adoption of article 4704, Rev. St., to institute a rule in the trial of these cases in reference to the demand for a jury and submission of the issue of damages, different from the general rule governing such matters. This article has to do more particularly with the apportionment of

the damages, and, while it is true that it says that "the jury may give such damages as they may think proportioned to the injury resulting from such death," we do not think it was intended to provide that a trial of this character of case could only be had before a jury, or that the court could not try the issue of damages if the requirements of the general law necessary to secure its determination by a jury had not been complied with.

[5] The other assignments complain that the judgment is excessive. It appears that the financial condition of the parents was such as that they would not probably need the services and financial aid of their son. The young man was still at home, devoting all of his time to the service of his parents, at the time of his death. There is nothing in the record to show that the son was under any particular obligation, either legal or moral, to continue to render his services to his parents, or that his disposition and inclination were different from those of the normal boy upon reaching his majority. Common experience teaches us that, when a young man reaches this age, the realization of his own manhood and sense of duty to his own individuality and career is apt to soon cause him to fare forth for himself and prepare to assume the responsibilities and relationships that result in the development of each individual life. The parents are entitled to recover only compensation for the services and contribution that might be reasonably expected to have been rendered them by their son. Having regard to these considerations, we are inclined to the opinion that the recovery was too large. In view of another trial, we refrain, however, from discussing this matter further and do not definitely pass on this assignment.

For the reasons stated, the cause is reversed and remanded.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes