### TEXAS COMPENSATION INS. CO. v. ELLISON.
### No. 9280.

Court of Civil Appeals of Texas. San Antonio.

March 21, 1934.

Rehearing Denied May 9, 1934.

Henry, Bickett & Bickett, of San Antonio, and Nelson Phillips and C. M. Means, both of Dallas, for appellant.

Bryan Blalock, of Austin, and Hamilton Lowe and D. B. Kirkham, both of Corpus Christi, for appellee.

SMITH, Justice.

In this workmen's compensation case Miss. Edna Ellison was the employee, the Southwestern Bell Telephone Company the employer, and the Texas Compensation Insurance Company the insurer. The jury found that the employee died as a result of an injury received by her in the course of her employment with the telephone company. Mrs. Nannie Ellison recovered compensation as surviving parent and sole beneficiary of the decedent.

At the time of her injury Miss Ellison was a long distance operator at the switchboard.

in the telephone company's exchange at Corpus Christi. She entered that employment about May 5, 1930. The injury occurred on September 15, 1930. She died on May 30, 1932.

Miss Ellison was sitting, with other operators, at the switchboard, with a "head-phone" at her ears, performing the usual duties of her employment. A rain and electric storm was in progress in the vicinity of Corpus Christi. According to the testimony of one of the operators " * * * something struck the wires and made the awfulest noise and was kind of quivering and knocked my head kind of to one side, when it struck. * * * You could feel it if you had your hand on the board and it made the awfulest noise and hurt your ears real bad. * * * Miss Ellison was sitting at one side of the room and when that struck I jerked my plug out and when I looked around the supervisors were carrying Miss Ellison out of the room, the supervisors were on each side of her. * * * She was crying and had her hands on her head and said, 'O, my head!' " A physician was hurriedly procured. Miss Ellison was carried home. Her mother testified: "They brought her in and she looked just like she was dead and her finger nails and lips were purple and she was as stiff as a board and I put her to bed and bathed her in hot and cold water and put her to bed. * * * She was unconscious and could not talk. * * * I put her to bed and laid down by her and had my arms around her. But she never did become conscious until up in the night about one or two o'clock and then she called and said 'Mamma' and I had my hands under her and said, 'What's the matter, honey?' And she said, 'Mamma, I am shocked.' * * * I said, 'Honey, how come?' And she said, 'I was putting a call through and got shocked.'" After a few days, however, she was able to return to her work, which she performed satisfactorily to the company, until May 20, 1932, twenty months after the injury. On the night of that date she was taken violently ill. Her mother testified: "She would complain at times. But, of course, it did not get so serious until right up to the last. On the 19th of May she worked until ten o'clock and got off that night and she didn't act right going home. We met her about a block from where she got off the bus and she would pick at him (her brother) and to play and he had a fever and had been working and said, 'Honey, I don't feel like playing,' and she would pick at him and she did not complain about anything hurting her that night and on the 20th of May

she woke me up about six o'clock and said, 'Mamma, get up, quick. I am dying. Bathe my feet in hot water and face in cold water. I am just like I was when I was shocked.' And she said, 'Get a doctor.' And her brother run in and said, 'Honey, what is the matter?' And she said, 'I am dying. Get Dr. Giles.' And he got him and he came in and put a hypo in her arm and he gave us something to give her. * * * Yes, we took her the 23rd to the hospital, about 8:30 on Monday morning and next Monday morning at 12:20 she died. She was raving when they got her there. It took Miss Whitley and the doctor and four nurses to hold her and they strapped her down to the bed and wrapped it around about five times."

The jury found, under appropriate instructions, that the employee was accidentally injured on the date of the accident; that the injury was caused by an electric shock; that the injury was the cause of her death on May 30, 1932.

It is contended by appellant in its first proposition that it was entitled to a directed verdict "because there was no causal connection between the alleged injury and the death of the employee." This proposition is based chiefly upon the facts, in brief, that a period of twenty months elapsed after injury and before death, during which period the employee performed her duties punctually and efficiently and without unusual absences on account of illness; that in that period the employee had not suffered from disease or injury and was in good health; that in the death certificate the attending physician attributed her demise to "infectious psychosis," and in proofs of loss made to insurance companies her death was attributed by the certifying physicians to "infectious psychosis," or "cerebral infection."

We cannot say, and least of all as a matter of law, that the facts recited overcome all the facts and circumstances adduced in the case to support the pleaded theory that the employee's death was ultimately caused by the accidental shock suffered by her on the night of September 15, 1930. On the contrary, it seems to us from a careful examination of the statement of facts that the great preponderance of the evidence points inexorably to a direct causal connection between the two events.

It is perfectly obvious that the unfortunate girl received a terrific shock, communicated to her through the headphone, and bringing death very close to her at the moment. That the shock profoundly affected her mental and

physical system, is equally obvious from the record. Theretofore she had been healthy, animated, bright, cheerful, but she never was so thereafter. It is true she continued, after a few days' confinement in her home, to perform her work efficiently, but it was only with great effort that she did so. According to her mother, "after the injury she was always run down and always had pains in her head, ears, neck, chest and back, and always complained * * * she never did act like the same. She would work but never would feel like it. * * *" According to a fellow operator, before the injury she "was a real sweet disposition girl, always laughing and talking to everyone. * * * After the injury she would come in to work and would sit off in a corner and would not talk to anyone, but would talk to you if you talked to her and she never did seem to take an interest in the work any more." Her brother testified that "before the accident she was always a girl that liked to play and laugh and have a good time and jolly and afterward she just wanted to lay around the house and did not want to go any place or do anything and wanted to be there with mother and the least little trifle would worry her and she worried over debts and things that would be trifles and make mountains over them and complained about her spine hurting her and the back of her head and she said she didn't believe she would ever feel good again." Her attending physician testified, according to a narrative of his testimony set out in appellee's brief, that on the night of the accident "he was called to the office of the Telephone Company and found the employee in a comatose state, unconscious on a couch and several girls rubbing her hands and feet. He gave her andirin, because her heart was very feeble and some morphine and probably strychnine. He and his son carried her home in his closed automobile. Her lips and extremities were cold and her fingers and nails were blue. Thereafter he treated her from time to time for nervousness. It would cloud up and the patient would get nervous. Quite often he would administer a sedative for this condition. She was anemic and run-down and nervous and high-strung and suffered more or less with hallucinations of things that were going to happen to her. And during cloudy spells she thought she was going to be shocked, as she called it. After the night he was called to the Telephone Office she was more or less jaundiced and a torpid liver; was very susceptible to cold. He saw her for the last time in May of 1932, and she had a cough and cold and was extremely nervous. It seemed that whenever the weather was storming or cloudy she would suffer from the idea that this lightning might strike her again. She was very nervous and did not know half the time what she was doing and had wild hallucinations on things that were utterly impossible." In addition, the medical testimony fully supported the jury finding upon this issue, which we approve. We overrule appellant's first proposition, as well as the related third and fourth propositions.

█ The jury found, under appropriate instruction, that decedent's death was "caused" by the injury in question, and appellant sought by requested issue to elicit a further finding as to whether said injury was the "proximate" cause of said death. The court properly refused to submit the requested issue. The rule of proximate cause, although an essential incident to negligence cases, has no place in compensation cases. Appellant's fifth proposition is overruled. Travelers' Ins. Co. v. Peters (Tex. Com. App.) 14 S.W.(2d) 1007.

█ Appellant insists that it was entitled to a directed verdict, for the reason that the injury involved was caused by an act of God, to wit, lightning, at a time when "the employee was not engaged in the performance of duties that subjected her to a greater hazard from such act of God than ordinarily applies to the general public." By this process appellant seeks to bring the case under the exemption from liability provided in article 8309, R. S. 1925, as follows:

"The term 'injury sustained in the course of employment,' as used in this law, shall not include:

"1. An injury caused by the act of God, unless the employee is at the time engaged in the performance of duties that subject him to a greater hazard from the act of God responsible for the injury than ordinarily applies to the general public."

We overrule this contention for reasons now to be stated.

We are of the firm opinion that an act of God is not available as a defense in a compensation case, unless the act operated directly upon the victim and caused the injury without the efficient intervention of any other agency or instrumentality. In other words, if the injury is induced, or directly contributed to by such other agency, it is compensable notwithstanding the cause of it may have had its remote origin in an act of God. It is not a question of proximate cause, which

has no place in compensation cases, but of active, immediate, contributing causes. Under that rule, if under no others, the defense of act of God is not in the case, for at the most the claimed act of God was but a vague and remote cause of the injury complained of. The injury was directly and immediately inflicted by a shock transmitted to the victim through the "head-phone" furnished by the employer and worn by the employee in the usual and normal course and place of her employment. It does not matter whether that apparatus was negligently constructed or insulated or maintained by the employer, or negligently adjusted or worn by the employee —it was none the less the man-made, direct instrumentality of her injury. These facts rendered the injury compensable, as a matter of law.

■■ Moreover, we are of the opinion that under the undisputed facts we have stated, the case is brought within the provision that an injury caused by the act of God will nevertheless be regarded as having been "sustained in the course of employment," if it is inflicted while the employee is "engaged in the performance of duties that subject him to a greater hazard from the act of God responsible for the injury than ordinarily applies to the general public." For, it is a matter of common knowledge and experience that metallic wires are conductors of electric currents generated by lightning, and positively attract such currents. In this case, hundreds, perhaps thousands, of wires, from points far and near, connect with the employer's switchboard, each wire a potential carrier of currents generated by electrical disturbances over a wide area, thus subjecting the employees working at that board to a hazard peculiar to the situation. The employee in this case was required in the per-' formance of her duty to wear at her ear an apparatus connected by wire to the network of wires centering in the switchboard, thus subjecting her to the multiplied dangers peculiar to her employment, whereas, the public generally, in that neighborhood, were not subject to that peculiar danger. Persons in the street, in the open fields, on the highways, in other buildings, or in other rooms in the same building, were not so subjected. They were subject, of course, to the danger of lightning, generally, wherever they were and whatever they were doing, but they were not subject to the peculiar, and obviously added, dangers incident to this particular employment in that particular place. We conclude that as a matter of law, under the undisputed facts, the case is clearly within the purview of the ex-

ception to the statute invoked as a defense by appellant, and that the injury is compensable. Apparently, there are no Texas cases upon the precise point, but the principle here announced has been upheld, and with obvious good reason, in this as well as in other jurisdictions. State v. Dist. Ct., 129 Minn. 502, 153 N. W. 119, L. R. A. 1916A, 344; Andrew v. Indus. Soc. (Eng.) 2 K. B. 32; DeLuca v. Park Comm'rs, 94 Conn. 7, 107 A. 611; State Road Com. v. Ind. Com., 56 Utah, 252, 190 P. 544; Deckard v. University, 92 Ind. App. 192, 172 N. E. 547; Consolidated Pipe Line Co. v. Mahon, 152 Okl. 72, 3 P.(2d) 844; Nebraska Seed Co. v. Ind. Com., 206 Wis. 199, 239 N. W. 432; Scott County School Board v. Carter, 156 Va. 815, 159 S. E. 115, 83 A. L. R. 229; Netherton v. Delivery Co., 32 Ariz. 350, 258 P. 306; Aetna Life Ins. Co. v. Ind. Com., 81 Colo. 233, 254 P. 995; U. S. Fidelity & Guaranty Co. v. Rochester (Tex. Civ. App.) 281 S. W. 307; Id., 115 Tex. 404, 283 S. W. 135.

This discussion, and these holdings, are based upon the assumption that the current which shocked the employee was caused by lightning, whereas, as a matter of fact, there is no probative evidence to support that assumption, or the submission of the precise issue to the jury, as requested by appellant and refused by the court. In the absence of a lightning stroke, there is no evidence of an act of God, and that defense is without that support; if there was a stroke, it could be no more than a remote cause of the injury, caused by a shock transmitted to the employee through the instrumentality furnished by appellant for the use of the employee; if the injury could be attributed to the lightning, as an act of God, it was compensable, nevertheless, for the reasons stated. These conclusions lead to the rejection of appellant's second and sixth propositions.

■■ As the employee in this case had been so employed for only four months at the time of her injury, the basis of compensation recoverable was required by statute to be upon the average weekly wage of other employees engaged in similar work for the year preceding the injury. Article 8309, § 1, 1st subds.' 1, 2, R. S. 1925. Appellant contends that there was not sufficient evidence to establish such basis in this case. We overrule this contention, propounded in appellant's seventh proposition. One of the operators working in the same office with the decedent, in the same character of service, testified that she had been so employed for more than a year prior to the accident, at wages specifically

described in her testimony. The award made in this case in pursuance of this testimony was well within the average so established, and the requirement of the statute was substantially satisfied.

 The jury returned an affirmative answer to issue No. 3: "Do you find from a preponderance of the evidence that said injury, if any, was the cause of the death of the said Edna Ellison on May 30, 1932?"

Quoting from appellant's brief:

"One of the attorneys for the appellee, in the course of his argument to the jury, made the following statement: 'Number three reads: "Do you find from a preponderance of the evidence that said injury, if any was the cause of the death of said Edna Ellison on the 30th day of May, 1932?" In the absence of proof, in the absence of evidence that something else caused the death, there is just one way to answer that question and that is "Yes".'

"The appellant's counsel immediately objected to the argument on the ground that it was contrary to the law and the charge of the court, as to the burden of proof, and was prejudicial.

"Thereupon, the attorney making the argument stated: 'I would answer that (referring to the objection) by saying that I was giving the gentlemen of the jury my personal conclusions. However, if Your Honor says that it was improper, I want to go on record as withdrawing the statement and telling the jury not to regard that statement.'

"Thereupon, the court stated: 'Go ahead with your argument.'

"Thereupon, the attorney making that argument proceeded with his argument to the jury."

Appellant insists that the transaction shows reversible error. We overrule appellant's eighth proposition, upon this point. The argument complained of propounded an erroneous theory of law, of course. But the charge of the court correctly defined the true theory, the duty of the jury was made plain in the issue, and when called to order by his adversary, appellee's counsel frankly told the jury that he had merely expressed his "personal conclusion." It does not occur to this court that the jury could have been misled by the incident. It is not conceivable that that incident had any influence upon the jury's finding, and we decline to reverse on account of it. Besides, it does not appear from appellant's brief that appellant pressed its objection to the point of a ruling, or that a ruling was specifically invoked, so as to support a contention here that the court committed affirmative error. This conclusion is fortified by the absence of a motion by appellant to instruct the jury to disregard the objectionable argument.

 Weekly compensation was awarded appellee, for three hundred and sixty weeks from the date of the injury to the deceased employee. Appellant complains of this phase of the award, contending, in effect, that compensation should not begin to run so long as the employee, temporarily recovering from the injury, drew current wages, as was the case here. The statute (Rev. St. 1925, art. 8306, § 8) plainly provides, however, that compensation to the beneficiary of a deceased employee shall begin at the "date of the injury" resulting in the employee's death. Appellant's ninth and last proposition is overruled.

The judgment is affirmed.

## On Motion for Rehearing.

In its motion for rehearing appellant complains that this court has gone out of the record to find that the employee was subjected to unusual hazards resulting from the act of God, that she was wearing a headphone connected by wire to a network of wires entering the switchboard, "thus subjecting her to the multiplied dangers peculiar to her employment." We do not feel that this criticism is justified. Certainly, we have not consciously gone out of the record in considering the case. The finding that the employee was subjected to unusual hazards, is but an obvious inference from the known fact that the employee was injured by an electric shock transmitted to her through the headphone she was wearing at the moment in, and as a means of, the performance of her work as a long-distance operator at the switchboard of a nation-wide telephone network, in its exchange in an important city, like Corpus Christi. Her peculiar danger was incident to her employment. Whether arising directly or indirectly from the act of God, it was uncommon, unusual, was not communicable to the general public not so situated. The authorities cited in the original opinion say this constitutes an unusual and therefore greater hazard resulting from the act of God within the contemplation of the exception to the statute invoked by appellant.

Appellant's motion will be overruled.