## TEXAS EMPLOYERS INS. ASS'N v. SHIFFLETTE.

### No. 11856.

Court of Civil Appeals of Texas. Dallas.
Jan. 11, 1936.

Dissenting Opinion Jan. 18, 1936.

Rehearing Denied Feb. 15, 1936.

Head, Dillard, Maxey-Freeman & McReynolds, of Sherman, for appellant.

Webb & Webb and Joseph C. Abrams, all of Sherman, and Simpson & Brewster, of Fort Worth, for appellee.

JONES, Chief Justice.

This is a workman's compensation suit, in which A. H. Shifflette is the deceased employee; Mrs. Byrde Shifflette, appellee and surviving wife of deceased, is the only beneficiary under the statute; the Fant Milling Company of Sherman is the employer; and the Texas Employers Insurance Association, appellant, the compensation carrier. The case was tried to a jury, all disputed issues of fact were found in favor of appellee, and judgment for appellee was entered in a lump sum for the statutory amount. An appeal has been duly perfected to this court, and the following are the necessary facts:

The suit was filed by appellee in a district court of Grayson county, to cancel an award of the compensation board. All necessary statutory steps were taken before the board, and also after the award, to give the district court jurisdiction of the case.

At the time of his death, deceased was an assistant to the head miller of the Fant Milling Company. This position he had occupied a little less than a year. For several years previous, he had been the head miller, but because of his failing health he became physically unable to perform such duties and was demoted to the position of second miller, or assistant to the head miller. The cause of his failing health was a disease of the heart known as myocarditis. This disease is described as an inflammation of the tissues of the heart muscle, generally caused by some infection in the system. The heart muscle consists of a large number of small tissues, differing from other muscle tissues only in their strength. The disease is practically incurable, but death from such disease may be warded off and life prolonged by patient observing proper care against violent exercise, taking a proper diet, and medical

treatment. Death resulted to deceased from this disease at about 2 a. m. September 1, 1931. One of the main controverted issues is whether the death resulted solely from the heart disease, or was contributed to and hastened by an injury suffered by deceased while at work, in the scope of his employment, on the forenoon of August 31, 1931.

The mill building embraced six floors and deceased was furnished an office on the fourth floor. His duties as assistant to the head miller carried him to the first four floors of the building. There was a passenger elevator running from the lower floor to the other floors of the mill, but on the day in question, such elevator was out of repair and could not be used until about 1 p. m. of the day in question. There was a freight elevator in the mill, running from the lower to the other floors of the building, but under the mill regulations no employee was allowed to be a passenger on this freight elevator. At approximately 9 a. m. deceased was seen by Austin, superintendent of the mill, on the first floor in the freight elevator. In response to question by Austin, deceased told him that it was necessary for him to go at once to the fourth floor, that the passenger elevator could not be operated, and that he was unable to climb the stairs; he was forbidden by Austin the use of the freight elevator and told either to go home and stay there until he was able to work, or to go up to the fourth floor and stay in his office until such time as he was able to work. Deceased left the elevator, was later seen on the landing of the first flight of stairs, going to the second floor; later seen on the third and fourth floors. All of the witnesses, except one, who saw him during this forenoon, described his appearance as being the same as usual. This one witness testified that he looked "kinda puny." No witness testified to any complaint of suffering made by deceased that forenoon. He was seen just as he was leaving the mill to go home to his lunch, and was described by such employee as looking cheerful and talking about when he and the witness could go dove hunting; the dove season opening the next day. That deceased mounted the stairs during this forenoon from the first floor to the fourth floor is definitely established by the evidence.

Deceased traveled from his home to and from his work by using his automobile. On the day in question, he left the mill at about 1 p. m. in his automobile, and arrived at his home about 1:15 p. m. When he returned from his work at noon, his usual custom was to park the car in the front of his residence, but on this occasion appellee noticed that he drove into the driveway instead, and stopped the car just opposite the window near where she was sitting, and she at once went to the car, where she found him pale, his features drawn, gasping for breath, and the appearance of suffering great pain. She asked him what was the matter, and he replied: " 'My heart,' and he says, 'I had—the manlift was out and I had to rush up those steps and I fell and it hurt me.' " Appellee assisted deceased out of the car, into the house, and onto a bed, where he continued for some time to gasp for breath, and apparently continued to suffer great pain. She bathed his face and chest with cold water, and in about forty minutes he apparently recovered. She noticed that, over the region of the heart, there was a small blue discoloration. After deceased had recovered at his home from his gasping for breath and suffering of pain, he went back to work that afternoon. Again he was seen just before he left the mill at 6 p. m.; he seemed to be cheerful, and no witness testified that any complaint of suffering was made. However, when he arrived home, he presented somewhat the same appearance as he had at noon, was put to bed, continued to suffer intermittently, and died about 2 a. m. The discoloration noticed by appellee at noon had increased, both as to color intensity, and as to the amount of surface covered, and continued to increase until death intervened, at which time it covered the whole surface region over the heart and extended considerably beyond.

The specific injury alleged is an injury to the heart caused by the violent exertion of climbing the stairs to the fourth floor of the building, in that this exertion placed a heavy strain upon the heart, and that in its weakened condition, the tissues of the muscle of the heart were caused to give way and death resulted as the proximate cause of this exertion. The effect of the answer of appellant is that the death of deceased was not caused by overexertion, but was the natural result of the heart disease from which deceased had been a long sufferer. The pleadings of both parties are sufficient basis for all of the questions raised on this appeal, and it is not deemed necessary to state the pleadings more fully.

Two serious questions are raised by appellant that require close consideration by this court: (1) That the evidence fails to show that deceased died as a result of any injury received while working in his employment; and (2) if there be any evidence sustaining appellee's contention that deceased's death resulted from an injury received by reason of an undue strain on his heart, because of his being compelled to climb the stairs, such evidence was hearsay and self-serving and erroneously admitted over proper objections of appellant and cannot form a legal basis for the submission of any issue to the jury, or a legal basis for any findings of the jury, or the entry of a judgment thereon. These contentions of appellant are properly presented in an able brief, and will be considered in the order above named. In line with these contentions, appellant timely presented a request for peremptory instruction, timely objected to the submission of any issues to the jury, and has properly assigned error on the adverse rulings of the court.

The following is the submission of the case on special issues and the verdict of the jury on each issue:

"No. 1: Do you find from the preponderance of the evidence that A. H. Shifflette, deceased, sustained an accidental injury on August 31st, 1931, while in the course of his employment for the Fant Milling Company? Answer: Yes." In connection with this charge, the court correctly defined the term "accidental" and gave the statutory definition of the term "injury."

"No. 2: Do you find from the preponderance of the evidence that the accidental injury, if any, sustained by A. H. Shifflette, the deceased, at the time in question, contributed to bring about his death? Answer: Yes.

"No. 3: Do you find and believe from the evidence that the death of A. H. Shifflette, deceased, arose out of and was caused solely by an existing diseased condition of his heart, without having sustained any accidental injury at the time in question? Answer: No, it was not caused solely by an existing diseased condition of the heart." In connection with this issue, the jury was specifically instructed that the burden was upon the plaintiff to establish the negative of this special issue by a preponderance of the evidence.

"No. 4: Do you find from the preponderance of the evidence that manifest hardship and injustice will otherwise result to plaintiff if a lump sum settlement be not made? Answer: Yes."

The findings of the jury are supported by substantial evidence, and are adopted as the findings of this court on the respective issues submitted.

■ Was it error to refuse appellant's request for peremptory instruction in its favor? It would be error, if the jury finding, to the effect that deceased sustained an accidental injury on the occasion in question, is not supported by substantial evidence. In this connection, it must be borne in mind that the question presented by the pleadings and evidence is not whether the alleged injury received was the sole cause of deceased's death, but rather: Did the injury contribute to cause his death? Texas Employers' Ins. Ass'n v. Lovett (Tex.Civ.App.) 19 S.W.(2d) 397; Texas Employers' Ins. Ass'n v. Jimenez (Tex.Civ.App.) 267 S.W. 752; Texas Employers' Ins. Ass'n v. Parr (Tex.Com.App.) 30 S.W.(2d) 305; Texas · Compensation Ins. Co. v. Ellison (Tex.Civ.App.) 71 S. W.(2d) 309. The evidence warrants the finding that, on the occasion in question, deceased, in order to perform the duties of his employment, was compelled to go up the stairs, rather than take his usual method of going up in the elevator, and that because of the unusual strain on the weakened and diseased muscle of his heart, one or more of the small tissues of the heart muscle suffered a rupture, causing a hemorrhage; this in turn placed another heavy strain on the heart, which resulted in another rupture; and death finally resulted. The medical testimony offered by appellee clearly warrants the finding of the jury on this issue of injury. The Workmen's Compensation Act, in its definitions, given in article 8309, R.S., declares that: "The terms 'injury' or 'personal injury' shall be construed to mean damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom." This is broad enough to include the injury herein considered.

It is true that deceased was suffering from myocarditis, which, in its advanced stage, might result in death to the sufferer at any time. The medical testimony offered by appellant is to the effect that one suffering from this heart ailment in its

earlier stages is able to do ordinary work with safety to himself, but that in the advanced stages of this disease such a sufferer cannot do such work. The evidence is undisputed that deceased had been doing regularly, day after day, for about a year, the duties that had been placed upon him; hence, we find that the disease was not in its advanced stage, and that at the time deceased was required to go up the stairs, in order to perform his duties, for the reason that he was not allowed the use of the freight elevator, a fatal termination of the disease was not imminent.

Dr. Craig, giving expert testimony, after he had qualified as a competent physician and surgeon, in answer to a hypothetical question covering the facts, testified: "Well, I would say from the way you have described that, that by reason of the fact that his heart muscle was subjected to a strain, running up those stairsteps, and it throwed more weight on the heart muscle, that some of those little fibers, that I just described to you awhile ago, ruptured, that is they were destroyed and broke in two * * *. When any of the little fibers are ruptured in any way there will be a certain amount of hemorrhage, say that no more than one of them was ruptured, there would be a certain amount of hemorrhage there and this blood would reach out and create a congestion, or in other words even a little small one would set up an irritation and cause a further strain on the heart and cause more of the little fibers to rupture, and that is why death was delayed because they just broke one by one." This witness also testified that the rupture of one or more of the tissues of the heart muscle would cause a weakness, great pain, a gasping for breath, and the discoloration named. We find that the exertion of climbing the stairs caused the first rupture in the heart muscle, and this produced the force that culminated in death.

We therefore find that the finding of the jury, to the effect that deceased sustained an injury on the occasion in question while in the course of his employment, is sustained by the evidence, and that the further finding that such injury contributed to bring about his death is also sustained by the evidence. For the same reason and on the same testimony, the jury's finding, to the effect that deceased's death was not caused solely by an existing diseased condition of the heart, is likewise sustained by the evidence, and that the

court did not err in overruling the request for peremptory instruction.

■ Was there an abuse of discretion by the trial court in admitting, over appellant's timely objection, the statement made by deceased to appellee on his return to his home at noon? The trial court admitted this statement under the somewhat obscure doctrine of res gestæ, for otherwise the statement would be self-serving and hearsay. The question of the admission of evidence, as a part of the res gestæ, is one of law, and must be determined in the first instance by the trial court. Southern Surety Co. v. Weaver (Tex.Com.App.) 273 S.W. 838, affirming (Tex.Civ.App.) 260 S.W. 622. The admission of particular evidence under the res gestæ rule rests largely in the discretion of the trial court. International Travelers' Ass'n v. Griffing (Tex.Civ.App.) 264 S.W. 263; Panhandle & S. F. Ry. Co. v. Laird (Tex.Civ.App.) 224 S.W. 305; Missouri, K. & T. R. Co. v. Anderson (Tex.Civ.App.) 198 S.W. 795; Pilkinton v. G., C. & S. F. Ry. Co., 70 Tex. 226, 7 S.W. 805; International & G. N. R. Co. v. Smith (Tex.Sup.) 14 S.W. 642; Panhandle & S. F. R. Co. v. Huckabee (Tex.Civ.App.) 207 S.W. 329.

■ "The res gestæ has been defined as those circumstances which are the automatic and undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act," and as "the whole of the transaction under investigation, and every part of it." 17 Tex.Jur. p. 613, § 256, and authorities cited in notes. The res gestæ differs according to the circumstances of the particular case. Pilkinton v. G., C. & S. F. Ry. Co., 70 Tex. 226, 7 S.W. 805; Southern Surety Co. v. Weaver (Tex.Com.App.) 273 S.W. 838. In determining whether evidence is admissible under the rule, each case must be tested by its own peculiar facts, and decisions in other cases cannot be made the guide except in their expressions of general and fundamental rules governing the doctrine. 17 Tex.Jur. 615–617, and authorities cited in notes.

The modern tendency of cases is to extend the res gestæ doctrine in the admission of evidence beyond its one-time narrow limits. Evans v. McKay (Tex.Civ. App). 212 S.W. 680, 688; 10 R.C.L. 974. This tendency to broaden and enlarge the scope of the rule of res gestæ is but the giving of concrete application to another modern announcement of the law of evi-

dence that, "The question is not now, how little, but how much, logically competent proof is admissible." 10 R.C.L. p. 976, § 158.

■ While it is true that, in determining the admission of proffered testimony under the res gestæ rule, each case must stand on its own particular facts, yet there are certain safeguards that must be taken into consideration, and not transgressed in any case: (1) To bring a declaration within the res gestæ rule, such declaration must be connected with, and arise out of, the transaction which is the subject-matter of the inquiry. The proffered statement may be separated from the act or transaction by a more or less appreciable period of time, but it must stand in immediate causal relation to it. It must be either a part of the transaction or made under such circumstances as to raise a reasonable presumption that it is a spontaneous utterance of thought created by, or arising out of, the transaction itself. 17 Tex.Jur. 618, § 259, and authorities cited in notes. (2) Again, to come within the rule, the statement must not only be a spontaneous utterance of thought, created by or springing out of the transaction itself, but must be such as to exclude the idea of premeditation. The facts attending the statement must lead to the reasonable conclusion that the statement offered in evidence was made under such circumstances that reason and reflection are not dominant, but that the statement was made from impulse. 17 Tex. Jur. 620, § 261, and authorities cited in notes. (3) The authorities above cited show that, while time is an important element in determining the question of spontaneity, it is not controlling, and is perhaps secondary to the condition of the declarant at the time the statement is made. Two important elements in reference to the admission of the statement are: (a) Was the declarant suffering great pain at the time the statement was made? And (b) did death from the injury follow soon after making the statement? Western Union Tel. Co. v. Brown (Tex.Civ.App.) 297 S.W. 267; International Travelers' Ass'n v. Griffing, supra.

■ The trial court's ruling, on the admission of this statement in evidence, is to be judged by the principles above discussed, and if the facts show such principles obtained, then there was no error. To give effect to the findings of the jury and the evidence supporting same, it must be considered as a fact that deceased's injury was primarily caused by the heavy strain on his heart, produced by the violent exercise of climbing three flights of stairs. Under the diseased condition of his heart, and by reason of this strain on it, there occurred a rupture of one or more of the tissues of the heart muscle. This could have happened when deceased fell exhausted while climbing the stairs, or it could have happened some time after the exertion. Under the medical testimony, a rupture of one tissue would put an additional strain upon his heart, which, in turn, would rupture another, and that there was a repeated rupture of a sufficient number of these tissues to cause death. In other words, the fatal ruptures were progressive and not simultaneous. It appears to be reasonably certain that, on his noon arrival at home, he was suffering from an immediate rupture of one of these heart tissues. In the throes of this suffering, he made the declaration to his wife that, "My heart—" and then stated that he had to walk up the stairs, that he fell, and it hurt him. This statement appears to have been the outburst of a thought that was uppermost in his mind at the time. It was made to his wife as explanatory of his physical condition. It is connected with, and arose out of, the happening which is the subject-matter of inquiry in this suit, and it stands in immediate causal relation to such subject-matter. It has all of the elements of a spontaneous utterance, as shown by the circumstances under which it was made and the person to whom it was made; the facts exclude the idea of premeditation. It appears that the particular facts of this case bring the statement of deceased within the general rules laid down for determining its admissibility, and we conclude that the trial court did not abuse its discretion, in overruling appellant's objections and in admitting the statement as evidence under the res gestæ rule.

The evidence raised the issue of appellee's right to a lump sum settlement, and the court, in special issue No. 4, submitted such question to the jury, and the jury answered that appellee should have a lump-sum settlement. While the jury was discussing this issue, and before a verdict on it had been reached, the jury, through its foreman, submitted the following written inquiry to the court: "Your Honor: We are in doubt in regard to Issue No. 4. In case she (appellee) is paid in weekly in-

stallments, and in case of death, does the policy become void, and all payments stop? or in other words say her premium would be $2000 in lump sum, but we made this into installments, and she should die within one month, would she receive the balance from the four weeks payments?" In response to which the court charged the jury: "The matters that you inquire about, under the charge of the court, are no concern of the jury. You will please answer Special Issue No. 4 as you find from the evidence, and under the charge of the court." The jury returned to a consideration of the case and later returned a verdict on all of the issues submitted. Whatever comments are shown to have been made by members of the jury, in their consideration of this issue, as shown by the record, do not show reversible error, and we overrule this assignment.

It follows that, in the opinion of the majority of this court, this case should be affirmed, and it is so ordered.

Affirmed.

BOND, Justice (dissenting).

I am unable to agree to the fact findings and conclusions reached in the majority opinion. A. H. Shifflette is dead, and that he died from a diseased condition of his heart there can be no question. He was a man past sixty years of age, suffering for several years prior to his death with a chronic heart trouble, which two attending physicians, Drs. Stout and Enloe, pronounced was gradually getting worse, and that he died solely as the result of the disease.

The deceased died at his home about 2 o'clock, a. m. on September 1, 1931. The only witnesses who saw him at or about the mill on the date immediately preceding his death are: W. E. Maddox, Frank Potter, C. D. Hopson, D. M. Austin, and Claud Atnip. The only witness who saw him on August 31st or September 1st, before his death, at any other place than the mill, is the plaintiff, Mrs. Byrde Shifflette. She saw him at no place except their residence.

I deem it advisable to quote literally much of the testimony of the witnesses, in view of my dissent, as to the findings of fact by the majority:

Dr. Stout testified that he had known Mr. Shifflette for approximately 15 years and, during that time, had treated him professionally for a diseased condition of the heart. In 1929, Mr. Shifflette had influenza, which caused infection of his respiratory organs, resulting in an inflammation of the heart, for which he treated him from September 8, 1930, to the date of his death; that his condition did not improve, but gradually got worse; and that "from the fact that he gradually became worse I could not see a favorable prognosis. I thought it was a question of time before there would be a fatality, and that he died as the result of a degeneration of the heart muscle, resulting from infection caused by influenza."

Dr. Enloe testified to the same effect as that of Dr. Stout; that he treated Mr. Shifflette professionally for a year prior to his death; that he found him suffering from inflammation of his heart, resulting from a prior attack of influenza, which, in the last few months of his life, was getting "progressively worse, affecting his heart muscle, a degeneration, lessening its power to pump, the function it serves. A man in that condition is in danger of death at any time; some live quite a period, but often exertion or strain hastens his death from that disease; that Mr. Shifflette died as a result of a diseased heart."

Mr. Potter testified that he had been working with Mr. Shifflette for about three years prior to his death; that Mr. Shifflette complained often of suffering with his heart, that his heart was giving him trouble; that his physical appearance was noticeable, some days he would be worse than other days, never appeared to be strong; and that during the year preceding his death it was easily detected that he wasn't as strong as he theretofore had been. He testified that Shifflette said that "he would have to take care of that heart of his, or that he would get bumped off."

Mr. Austin testified that during the preceding six months prior to Mr. Shifflette's death, "he would be off three or four weeks for a time and seven weeks I think it was and a whole lot you know just times and times, time after time. We really didn't pay much attention when he was off and when he was working and when he was not working, we always had somebody else to take his place, I don't know hardly how to explain, but we didn't expect a lot out of him, that is after he had been sick so long and things like that, we just kind of drifted along."

Mr. Atnip testified that for a year prior to Mr. Shifflette's death he told him that his heart was bothering him'; and that

he was taking medicine, strychnine tablets, for his heart.

Mrs. Shifflette testified that, during the year prior to his death, Mr. Shifflette was taking, regularly, digitalis, amytal pills or tablets, and other medicines to stimulate his heart action.

The above-recited facts, to my mind, reveal that the disease of which Mr. Shifflette was suffering was in its advanced stage; that he died as the result of the disease; and that such is not controverted by the testimony of Dr. Craig, in answer to a hypothetical question, recited in the majority opinion, that "the running up those stair-steps, 'the heart muscle was subjected to a strain, ruptured the muscle fibres, causing hemorrhages, thereby producing death.'" There is no testimony in the record that the deceased "ran up the stair-steps"; thus, the hypothesis, on which Dr. Craig's testimony is based, finds no support in the record.

Reviewing further the facts in their chronological order:

On the fatal day, August 31, 1931, Mr. Shifflette left home, operating his own automobile; at 7 o'clock he was seen on the fourth floor of the mill by Mr. Atnip, who testified that there was nothing "unusual about his action or appearance"; at 8:30 or 9 o'clock Mr. Austin and Mr. Maddox saw him on the first floor of the mill, starting to take the freight elevator, going up, when Mr. Austin said to him: "Mr. Shifflette, we are going to use that elevator, and you cannot use it with passengers." Mr. Shifflette said: "I am sick." Mr. Austin said: "Are you sick?" Shifflette said: "Yes." Mr. Austin said: "Well, go home, if you are sick, go ahead home, I don't want you to work if you are sick." Mr. Shifflette said: "I am not that sick." And then Mr. Austin said: "You go upon the roller floor, that is the grinding floor, the fourth floor, and you stay up there until I get the manlift running, and you go on up there and tell Mr. Hopson I told you to go up there and stay until you get ready to go home." About an hour after the above-related conversation with Mr. Austin, Mr. Maddox saw Mr. Shifflette on the stairway, on the first landing, between the first floor and the second floor, quoting from his testimony:

"Q. What were you doing at that time? A. I was passing through the shaft.

"Q. You were not on the same stairway he was on? A. No, sir.

"Q. Was he going up or coming down the stairway? A. Going up.

"Q. Describe what you saw him doing. A. He was walking when I saw him.

"Q. Was there anything unusual about his walk? A. I never noticed it, if there was."

At about 10 o'clock, Mr. Hopson saw Mr. Shifflette on the fourth floor of the mill, had a conversation with him, in which Shifflette said that "he had been downstairs and Mr. Austin sent him up there to the fourth floor and told him to stay on that floor until they could get the manlift to running;" and he says, "I cannot climb those stairs."

"Q. What was his appearance at that time, describe it? A. I couldn't tell anything out of the ordinary.

"Q. Did he make any complaint to you? A. No, nothing more, only just said he could not climb the stairway.

"Q. Did you see him apparently exhausted, lying around resting or overcome with any unusual condition at any time during that day? A. No."

The record shows that during the forenoon several of the above-named witnesses saw Mr. Shifflette on the fourth floor of the mill, doing his usual work of supervising the process of milling; saw him about 1 o'clock go to his noon meal; and each described his appearance as being the same as usual, talking of going dove hunting on the next day. The deceased traveled to his home, again operating his own automobile, arriving there about 1:15. His wife saw him stop at an unusual place, and immediately went out to where he was, saw him gasping, his face drawn and very pale, appeared to be in pain. She helped him out of the car, took him in the house, and on the way to the house, over objection, Mrs. Shifflette was permitted to relate what the deceased said, i. e. "Well, he just said, 'My heart,' and he says, 'I had—the manlift was out and I had to rush up those steps and I fell and it hurt me.'"

As I view the testimony, it not only fails to show that the deceased ran up the stairway, establishing the hypothesis for the testimony of Dr. Craig, in answer to the hypothetical question propounded to him, but against the theory on which it is based; furthermore, there is no testimony of the deceased being "compelled to go up the stairs in order to perform his duties," as found by the majority; or that the deceased told Austin that "it was necessary for

him to go at once to the fourth floor"; or that "the disease of which the deceased was suffering was not in its advanced stage"; or that the deceased "was requested to go up the stairs at the time, to perform his duties"; or that "the deceased sustained an injury on the occasion in question, contributing to his death"; or that "the deceased fell exhausted while climbing the stairs"; furthermore, there is no testimony that the deceased "rushed up the steps, fell and was hurt," to sustain the hearsay declaration of Mrs. Shifflette of what her husband said to her four hours after he climbed the stairs.

On the contrary, as I view the testimony, it shows that the deceased was in the advanced stages of heart disease; that he traveled to and from his work, operating his own automobile; that, on the fatal day, he was a sick man, said "he was sick," and at 8:30 or 9 o'clock, Mr. Austin told him to go home or to the fourth floor of the mill, on account of his illness, and remain there until the manlift was put into operation; that, in about an hour thereafter he was seen walking up the stairway in his usual walk, and it may reasonably be presumed he continued the walk to the fourth floor; that he was seen by Mr. Maddox about 10 o'clock on the fourth floor, at which time he related the orders given him by Mr. Austin. Mr. Shifflette was seen at various hours in the forenoon and until one o'clock in the afternoon on the fourth floor, going about supervising the process of milling, making no complaint to any one as to having fallen or hurt himself in climbing the steps; but, on the contrary, apparently was not hurt, talking and planning on going dove hunting on the next day. Mr. Shifflette arrived at his home at 1:15. Mrs. Shifflette, over objection, related what deceased said to her on arrival at his home, as to the cause of his condition.

The evidence is undisputed that, during the afternoon, at 2 o'clock, he returned to the mill, was seen on various floors performing his duties as an assistant to the head miller, talking to other employees about the dove hunt of the next day. At 6 o'clock, he was seen in a happy mood, one describing his actions as "waltzing out of his office," removed his work clothing, washed himself, preparatory to going home, dressed himself, and traveled home, again operating his own automobile. No complaint was made either in the forenoon or afternoon to any of his fellow workmen of being hurt, or having fallen on going up the stairway; there was nothing unusual about his appearance and action.

To my mind, under the related facts, it is inconceivable that the deceased told Mrs. Shifflette: "I had to rush up those steps and I fell and it hurt me," as there is no evidence of the principal occurrence about which the statement was made; and, manifestly, the related statement is against the uncontroverted evidence that there was no such occurrence.

Furthermore, if the statement was made, the declaration is clearly hearsay and inadmissible under the res gestæ rule announced by the authorities of this state and approved text-writers. It was made four hours after the deceased was seen ascending the stairsteps; and, if any injury occurred, Mr. Shifflette's mind had been restored to its normal status after the occurrence and before the declaration admitted in evidence was shown to have been made.

As stated above, the deceased, after ascending the steps, went about his usual business, talking about and planning a dove hunt for the following day, and apparently in his normal status. The statement attributed to him, as to the cause of the injury, was but the statement of a past event, and was but the deceased talking about the facts rather than the facts talking through the deceased.

In the case of Lumbermen's Reciprocal Ass'n v. Adcock et al. (Tex.Civ.App.) 244 S.W. 645, 649, Mrs. Adcock and her two minor children obtained judgment in the trial court upon a policy of workmen's compensation insurance against the insurer. Adcock was employed by a lumber company and was working at a sawmill. It was plaintiff's theory that Adcock was injured in undertaking to raise a log. Mrs. Adcock testified that he came home about 10 o'clock, complaining of an injury to his urinary organs and claimed to be suffering severely; that she could see that he was in fact suffering, as he claimed to be. She was permitted to testify, over objection, that "Mr. Adcock, when he got home at 10 o'clock, did tell her how he was injured and stated to her that while he was walking from one side of the boat to the other in the discharge of his duties at the log boom, he fell astride the crossplank or timber and injured himself in the locality of his urinary organs, and that he was suffering from the injury, and told Mrs.

Adcock to send for a doctor." The court, in the opinion, said:

"Was his statement to his wife as to the cause of his injury admissible as res gestæ? We have concluded that it was not. That statement, if made, as to the cause of the injury, was but the statement of a past event, which had taken place several hours before, and was not the expression of present pain and suffering, and we know of no case in Texas which has gone to the extent of making Adcock's statement to his wife as to the cause of his injury admissible as res gestæ.

"The cause of Adcock's injury in this case was the first question to be determined. It was, of course, necessary also, before recovery could be had by appellees, to show that the injury, if it occurred while performing his duties, was the cause of or materially contributed to his death. But the statement to his wife that he was injured while performing the duties of his employment and how it came about, was clearly not admissible. St. Louis & S. W. Railway Co. v. Gill (Tex.Civ.App.) 55 S. W. 386; Ft. Worth & D. C. Railway Co. v. Stone (Tex.Civ.App.) 25 S.W. 808; Texas & N. O. Railway Co. v. Crowder, 70 Tex. 222, 7 S.W. 709; Roth v. Travelers', etc., Ass'n, 102 Tex. 241, 115 S.W. 31, 132 Am.St.Rep. 871, 20 Ann.Cas. 97."

We could well rest this case on the reasoning of the court in the Adcock Case and the cited authorities; the situation is similar.

In the case of McDowell v. Security Union Ins. Co. (Tex.Civ.App.) 10 S.W. (2d) 782, 785, a workmen's compensation case, brought by the wife and minor children of J. H. McDowell, deceased, a similar situation as here was presented. The El Paso Court of Appeals said: "It was not error to refuse to permit Mrs. Sophia McDowell to state what her husband said to her after he arrived at home some two hours or more after he was seen to leave the power house, as to when and where he fell and received the injury on his temple. Any statement he would then make would not be admitted as original evidence under the rules of res gestæ. Lumbermen's Reciprocal Association v. Adcock (Tex.Civ. App.) 244 S.W. 645, in which Judge Hightower for the Beaumont court discusses the rule and refers to many Texas cases sustaining his conclusion. We refer to that case and the cases used as stating the Texas rule."

In Roth v. Travelers' Protective Ass'n of America, 102 Tex. 241, 115 S.W. 31, 34, 132 Am.St.Rep. 871, 20 Ann.Cas. 97, opinion by Judge Brown of the Supreme Court, the suit was to recover from the insurer upon a policy on account of Roth's death resulting, while skating upon an ice-covered pond, he fell upon the ice. A short time afterwards, he became ill and died. A man by the name of White was Roth's companion at the time of the fall. The opinion reads: "The plaintiff took the deposition of J. W. Sullens, who met White and Roth on the streets of Henryetta as the latter were returning from the pond where they had been skating. In answer to an interrogatory the witness detailed statements made by White and Roth with reference to the latter's fall on the ice, all of which we hold to be inadmissible, because it was hearsay, except that which states the action of Roth in placing his hand to his head, which might be admitted, with the accompanying statement, 'it hurt my head and made it ache,' being limited to proof of the fact that his head ached at the time he was speaking, but not to be considered as evidence to establish the fact of the fall or of striking his head on the ice."

In the case of International & Great Northern Ry. Co. v. Anderson, 82 Tex. 516, 17 S.W. 1039, 1040, 27 Am.St.Rep. 902, the Supreme Court, speaking through Judge Gaines, say: "All declarations or exclamations uttered by the parties to a transaction, and which are contemporaneous with and accompany it, and are calculated to throw light upon the motives and intention of the parties to it, are clearly admissible as parts of the res gestæ. Very respectable authorities restrict the doctrine of res gestæ within the limits indicated by the foregoing definition, and exclude all declarations which are a narration of past occurrences. This is a convenient and salutary rule, and probably the more logical one; and, if it were an open question in this state, we should hesitate long before adopting another. Another rule, applied in many of the American courts at least, is to admit as parts of the res gestæ not only such declarations as accompany the transaction, but also such as are made under such circumstances as will raise a reasonable presumption that they are the spontaneous utterance of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the re-

sult of premeditation or design. * * * In most of the cases cited the declarations admitted were the relation of past occurrences. This line of decision has been followed in this court (Galveston v. Barbour, 62 Tex. 172 [50 Am.Rep. 519]), and, in view of the great array of authority in support of that ruling, we deem it best to adhere to it in this case."

In the case of International Travelers' Ass'n v. Griffing (Tex.Civ.App.) 264 S.W. 263, 265, Judge Looney, speaking for this court, said: "A declaration made or an act done after the happening of the principal fact may be admissible as a part of the res gestæ when it is so intimately interwoven with the principal fact by the surrounding circumstances as to raise a reasonable presumption that it was made or done under the immediate influence of the principal transaction or event itself, and is the spontaneous utterance or expression of thoughts created by and springing out of the transaction itself rather than the result of premeditation or design. * * * In order that evidence of acts and declarations, otherwise objectionable, may be admitted under the res gestæ rule, it must appear that they are the spontaneous outgrowth from, in fact a part of, the principal litigated act, and, in determining the question of spontaneity, courts will also look to the condition of the declarant at the time of making the statement. A statement will ordinarily be held spontaneous if at the time when made the condition of declarant was such as to raise the inference that the effect of the occurrence on his mind still continued as when he had received an injury and was suffering severe pain. The element of time is not controlling, but is important, as it is obvious that a declaration or act is usually spontaneous in proportion as it is near in point of time to the occurrence that called it forth; but, at least, the decision of each case must turn on its own peculiar facts."

The Supreme Court of the United States, in the case of Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 26, 78 L.Ed. 196, said: "In damage suits for personal injuries, declarations by the patient to bystanders or physicians are evidence of sufferings or symptoms (Wigmore §§ 1718, 1719) but are not received to prove the acts, the external circumstances, through which the injuries came about."

In 22 Cor.Jur. § 554, p. 466, the rule is announced: "An important consideration is whether there intervened, between an occurrence and a statement relative thereto, any circumstances calculating to divert the mind of the declarant, and thus restore his mental balance and afford opportunity for deliberation. Diversion of thought may be the result of attention to other matters, etc."

The application of these principles to the undisputed facts of this case, in the writer's opinion, forces the conclusion that the testimony complained of is clearly the hearsay narrative of a past transaction and not the contemporaneous or spontaneous declaration of the deceased. As above stated, four hours had elapsed. No witness saw the deceased fall, and no one saw him either in pain or excited. There is nothing to raise any doubt that he continued his work in the usual way for a period of four hours after he ascended the stairs. He made no complaint, and, among other things, talked about going dove hunting the next day; that being the opening of the dove season. There is no testimony in the record as to when, where, and how Shifflette was injured, if he was injured. The appellee's pleading alleges that he was injured "going up the stairs"; the evidence fails the allegation.

It is a fact of universal notoriety, that every one may fairly be presumed to be acquainted with, the disease of the heart is insidious, leading all diseases which cause death to the human race. Because a man dies of the disease, no presumption can arise of an accidental injury producing or hastening his death. To sustain the judgment in this case, the presumption must be indulged that the deceased rushed or ran up three flights of steps, fell, and was hurt, from which he died. There is no evidence of such occurrence; but, on the contrary, everything points to the fact that the occurrence did not happen, and, according to the constant and invariable course of nature, Mr. Shifflette died solely as the result of his ailment.

Under the authorities cited, the writer has no doubt that the court was in error in admitting, over appellant's objection, Mrs. Shifflette's evidence, to the effect that he was injured in rushing up the staircase, fell, and was hurt. The able attorneys for appellee recognize, and so sustain in their brief, that the admissibility of this testimony is the gravamen of the case; the facts are fully developed. In the writer's opinion, the case should be reversed and here rendered for the appellant.