TEXAS EMPLOYERS INS. ASS'N

v.

NOEL et al.

No. 15526.

Court of Civil Appeals of Texas.

Fort Worth.

June 18, 1954.

Rehearing Denied July 9, 1954.

Leachman, Matthews & Gardere and Henry D. Akin, Dallas, for appellant.

Peery, Wilson & Spell and Kearby Peery, Wichita Falls, for appellees.

MASSEY, Chief Justice.

From a judgment for death benefits under the Texas Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq. The insurer appealed.

Judgment affirmed.

Ellis Noel was an employee of the Jim Fish Drilling Company for approximately fifteen years upon the occasions material to this case. Upon such occasions the Texas Employers Insurance Association had in force on such Company's employees a policy of Workmen's Compensation Insurance. Noel was married and had one minor child.

On or about date of February 3, 1953, Noel was employed as a "pumper" for his employer, a job in the oil industry which requires such an employee to make regular visitations to sites where oil wells are producing oil. Those of such wells which require pumps are connected to machinery which operates pumps on one or more wells, each pump bringing the oil from under the surface and thence directed into pipe lines or other containers. The pumps are ordinarily connected with the machinery which provides the operational power of the pumps by steel cables and rods.

On February 3, 1953, Noel left his home at about 7:45 o'clock in the morning to go to a location known as the "Ramming Lease" where there was at least one producing oil well which had been placed on the pump. The pumping mechanism of a well had broken loose from the power mechanism by reason of a steel cable or rod having become broken or disconnected. As result of this the pump was not in operation and no oil was being brought to the surface of the earth. When such a situation is existent it is necessary to the production of oil from the well that the broken or disconnected cable be repaired or reconnected. The distance from the Ramming Lease to the Noel home is not disclosed from the record, but it could not have been very far since shortly after 9:00 o'clock the same morning Noel arrived back home in his pickup truck. Upon his return he was observed to be "holding his chest", to have a "pallor—yellow complexion", to have been in such condition that he "couldn't hardly speak for short breath", and to be "walking with difficulty". Noel's wife testified that he appeared to be in pain at the time. She asked him, " 'What in the world is the matter?' " In response to the question so asked, Noel stated that he had a terrible pain in his chest. He made the further statement to the effect that he had hurt himself. In addition to that which Noel may truly be considered to have said in response to the question asked him (which was an inquiry of what was the matter with him), he made a statement to the effect that he was " 'picking up the well with my come-along-boomer and a pain hit me in the chest' ".

A physician was promptly called to the house to attend Mr. Noel. After spending three days at home, Noel was removed to a hospital at Wichita Falls. During the period he was at home he continued to suffer pain, experienced choking symptoms, and failed to improve so that he could safely get out of bed. He remained in the Wichita Falls hospital for a ten day period, and improved somewhat so that it was decided that he could be safely moved back to his home. He returned home on February 17, 1953, and on the third day

838

following, or February 20th, he started to get up from a bed or chair, again experienced severe chest pain, and began to choke. He was rushed immediately back to the hospital by ambulance. He died approximately twenty minutes after his arrival at the hospital.

Joe Noel, the deceased's seventeen year old son, went out to the lease in question and to the well where his father had been on the morning on which he experienced his pain. His trip was made either the same day or the day following. He found that the rods which had broken apart, resulting in an interruption of the power from the power machinery to the pump on the well, were still apart and not reconnected. He found that his father's "come-along-boomer" was connected to the severed rods as would be the case upon an initial connection prior to application of pressure to this type of machine or tool to bring the rods together for permanent connection. The "come-along-boomer" was described as a manual winch—a winch with a handle on it. As descriptive of his testimony, photographs of the machine or tool in operation were introduced, and from the photographs and the testimony it is clear that a "come-along-boomer" is an oversized wire stretcher or fence tightener. It may be used to pull taut a steel cable to which is connected a steel rod, which then may be connected to another rod by use of a cotter key and cotter pin, or by the use of other similar connection parts. Once so connected the "come-along-boomer" may be disengaged and removed. Operation of a "come-along-boomer" is the reverse of that of an automobile jack, and by lever operation physical objects are drawn together rather than pushed apart as in the case of the jack. The pressure for the operation is exerted horizontally and by pushing or pulling rather than by lifting or pressing down. The normal operation involves a pulling upon the lever, throwing the weight of the body away from the lever handle, plus any bracing that the operation permits in order to increase the force exerted, at least at the point of time when the objects being

drawn together are offering pressure resistance, such as would be true once a cable is drawn taut.

Since the testimony about the condition in which the "come-along-boomer" was found to be did not demonstrate in itself that the lever had been worked in such a fashion that there was any tension on the objects it was connected to for the purpose of drawing such objects together, but contrarily only that such tool or mechanism had been hooked on to both of such objects in the manner that they are connected prior to the time the winch-operation would be begun, it is our opinion that but for the statements the deceased made upon his arrival home in the pain and distress heretofore mentioned, proof of the injury alleged as arising out of physical exertion in pulling on the "boomer" lever would be wanting.

█ The appellant objected to the introduction of the testimony from the wife and mother-in-law of the deceased about the deceased's statements as being hearsay. Clearly they were hearsay and such testimony should not have been received unless it was res gestae. Res gestae declarations are exceptions to the general rule which exclude hearsay statements. When such evidence is admitted it must be necessary that it be admitted in the establishment of some material fact, or in contradiction of a material fact, thus warranting its admission as a necessity. It is admissible further upon the additional supposition that the circumstances under which the declarations or statements were made afford sufficient probability of their truth warranting their being received and considered by the jury for what the jury may deem them to be worth. The existence of such a necessity and of such circumstantial guaranty of trustworthiness form the basis for determining the admissibility of hearsay evidence in any particular case. 17 Tex.Jur., p. 531, sec. 215.

In the case of City of Houston v. Quinones, 1944, 142 Tex. 282, 177 S.W.2d 259, 262, is found the following statement: "* * * The general rule relating to

this question is that res gestae evidence is not the witness speaking but the transaction voicing itself. * * * In determining whether evidence is admissible, each case must be tested by its own facts; and if upon a fair analysis a statement after the event does not appear to be a continuation of such event, it cannot be res gestae, even though made near the time of the occurrence. Statements must be either a part of the transaction or made under such circumstances as to raise a reasonable presumption that they are spontaneous utterances of facts arising out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation or design. * * * (Citing authorities.)"

■■■ We perceive no distinction between the rule as to such evidence in civil or criminal cases. As to the requisite of spontaneity, it has been stated that spontaneity may be deduced from such facts as show that there has been no change in the mental condition of the party making the statement from the time of the principal act until the statement was made. 18 Tex.Jur., p. 297, sec. 182. If the declarations sprang out of the principal transaction, tend to explain it, and were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous in point of time, and are admissible.. 18 Tex.Jur., p. 299, sec. 183. It has been held that res gestae include not only the statements made by the injured party almost contemporaneously with the occurrence of the injury, but also those relating to the consequences, made while the latter subsisted and were in progress. Johnson v. State, 1891, 30 Tex.App. 419, 17 S.W. 1070, 28 Am.St.Rep. 930. It is significant that this decision cited the case of Commonwealth v. McPike, 3 Cush., Mass., 181, which was one of the authorities cited (along with others) by Judge Gaines in the case of International & G. N. R. Co. v. Anderson, 1891, 82 Tex. 516, 17 S.W. 1039, 27 Am.St.Rep. 902, followed immediately by Judge Stayton in the case of Texas & P. Ry. Co. v. Robertson, 1891,

82 Tex. 657, 17 S.W. 1041, 27 Am.St.Rep. 929. All of these decisions were handed down in the month of December, 1891, and the case of International & G. N. R. Co. v. Anderson is recognized as the case establishing the more liberal rule as to such character of evidence as the law of this state.

■■■ It is observed from the cases that extreme doubt exists when the statements sought to be introduced as res gestae evidence were made in response to questions asked. While the deceased's statements as to the fact of his injured condition and as to the pain he was experiencing therefrom were truly responsive to the question asked, his statement relative to the manner in which he experienced his injury was not. In view thereof, our problem is not complicated as would have been the case had his statement been made upon a direct request that he describe the manner in which his injuries were received. We believe it follows therefore that the trial court was vested with discretion to rule upon the question of whether or not the evidence should be admitted as res gestae testimony, since the circumstances demonstrated with reasonable certainty that the deceased's declarations were not the result of premeditation or design, and since they fairly appeared to be a continuation of the event constituting the transaction because the pain resultant from the deceased's injuries was still subsisting and in progress at the time the statements were made. Under such circumstances there is a reasonable presumption that his utterances are spontaneous utterances of fact arising out of the transaction itself.

It is believed that the following authorities support our holding in this regard. Atkinson v. United States Fidelity & Guaranty Co., Tex.Civ.App.San Antonio 1950, 235 S.W.2d 509, error refused, n. r. e.; Texas Employers' Ins. Ass'n v. Wade, Tex.Civ.App.Galveston, 1946, 197 S.W.2d 203, error refused, n. r. e.; Texas Employers Ins. Ass'n v. Shifflette, Tex.Civ. App.Dallas, 1936, 91 S.W.2d 787, error dis-

missed. The student is directed to dissenting opinion of Judge Bond in the case of Texas Employers Ins. Ass'n v. Shifflette for an excellent analysis of other analogous cases touching upon the question here presented

■ Appellant predicates a point of error upon the photographs introduced during the course of testimony by the deceased's son. These photographs were of a "come-along-boomer" in operation. They showed the manner of connection of the machine or tool to objects sought to be brought together through its manipulation, and also some unidentified person pulling upon the lever in its operation. To our view such photographs are most useful when properly illustrative of the manner of use of some instrument, machine or tool, not clearly understandable from a witness' testimony. When a proper predicate is laid, it is within the trial court's discretion whether such photographs are admissible. The objection to their introduction was premised upon a contention that no proper predicate was laid. Since we have held that the statements made by the deceased upon his arrival home following his injury were properly received by the jury, and since the deceased's son established by his testimony that the way and manner of the use of the "come-along-boomer" made by the individual in the photographs was usual and customary, and also was similar to the way and manner in which the deceased ordinarily operated the same type of machine or tool, a proper predicate was laid.

. Appellant has predicated another point of error upon a somewhat similar premise. In the hypothetical question directed by appellees to a physician called by them as a witness upon the probable cause of death, their attorney assumed as truth the res gestae statements made upon the return of the deceased to his home on the morning of February 3rd. Appellant contends that no proper predicate was laid in that the question assumed as fact in evidence the res gestae testimony as to injury. Since we have held the testimo-ny admissible, the point of error is overruled.

■ Other points of error urged by appellant by which it complains of the judgment entered are premised upon its contention that there was no competent evidence to warrant submission of the case to a jury, or to support the verdict returned, or that the verdict was contrary to the great weight and preponderance of the evidence, etc. These points are overruled in view of our having held the same testimony admissible as res gestae. It is noted that the appellant offered no evidence whatever and the only evidence in the record came from witnesses offered by appellees.

Appellant contends error through the refusal of the trial court to grant a new trial to appellant, since one of the jurors empaneled to try the case failed to reveal to appellant during the course of its voir dire examination of the panel that he had once had a claim for benefits under the Workmen's Compensation Act of Texas for injuries received by him.

■ The following proceedings occurred during the course of appellant's examination of the jury panel, following the examination of the panel by the appellees through their attorney. It may be remembered that one of the panel members, a Mr. Leath, had stated that he had had some character of claim for compensation at a prior time during his lifetime during the course of the examination of the panel by appellees' attorney.

"Mr. Gardere: (Appellant's attorney).
* * *

"Other than Mr. Leath, who made the only answer that I heard, has any of you, or immediate family, ever had a compensation claim?

"(Juror unidentified)

"Q. What was the nature of your claim? A. (Answer inaudible.)

"Q. I see, that was not a compensation claim.

"Q. Mr. Terrell, was that settled without a law suit? A. (Answer inaudible.)

"Q. Was it settled to where it left no bad taste in your mouth one way or the other? A. (Answer inaudible.)

"Q. Of course, we lawyers ask an awful lot of questions and still at times we find we didn't go even as far as we might have gone and a lot of times something does come up in your deliberations which may recall something about which you were not questioned. If you are accepted as a juror and something does come up about that back, could you totally disregard that and let your answers in this case be based solely on the evidence that you hear from this witness stand and the law given to you by Judge Haley, that, and nothing else? A. (Answer inaudible.)

"Mr. Gardere: Now, gentlemen, that same question, can each of you use that as a guide and will use it as a guide if you are selected as jurors? Now, other than Mr. Leath and Mr. Terrell

"Mr. Ross: I had my glasses broke.

"Mr. Gardere: Well nothing about that could possibly affect your verdict?

"Mr. Ross: Oh, no.

"Mr. Gardere: Now, other than compensation claims have any of you had claims having to do with personal injuries of any kind—injuries suffered in an automohile accident, fall in a store or— None of you have, by your silence."

In its amended motion for new trial the appellant set forth the fact that it asked of the panel the question first set forth, to which only panel member J. C. Terrell responded. The appellant claimed that by their silence all the other members of the panel indicated that they had not had any compensation claim. That appellant thereafter inquired: " 'Now, other than Mr. Leath and Mr. Terrell' ", to which the juror James S. Ross replied, " 'I had my glasses broke.' " Appellant contends that in fact Mr. Ross had sustained an injury to the upper lid and cornea of his right eye, for which he received compensation benefits. Appellant further contends that it had no knowledge of said injury or compensation claim until after the trial of the case, that had it known such at the time it would not have accepted said juror but would have peremptorily challenged him.

Upon the hearing on the motion for new trial, Mr. Ross was placed on the stand and interrogated by the attorney for the appellant. He stated that he did not remember being asked whether he had ever had a claim for compensation. The particular question asked was read to him and he stated that he did not remember that it was asked, then added: "* * * He (appellant's attorney) asked something and I don't remember now what it was, and I started to tell him about a claim that I had, and I got—oh, I just got started—I told him about breaking my glasses—* * * —and he cut me off, and he said, 'Oh, well, you got that fixed up all right, didn't you?' and I said, 'Yes, sir'. Well, we did, all right. That was true, we did. And that was all that was said and he turned around and was talking to somebody else, or talking to something—I don't know what. I never paid any attention—I don't remember now, and that was all I ever said."

Upon the appellant's attorney then reading from the record made by the court reporter just what the words stated by him were immediately following the statement by Mr. Ross about his glasses having been broken, Ross agreed that that was the way it had occurred. Then the following occurred:

"Q. What was it that you didn't tell him about? A. Well, I was going to tell him I broke my glasses out there—it was out here at Sheppard Field, four or five years ago—I don't know when. I don't even remember who I was working for. You see, we worked for the contractor and I don't even remember the contractor now. I slipped—I was standing on the ground —we had sawed out part of the floor and I was standing on the ground in a rather tight place, a very awkward position then,

and I was pushing on a wrench * * * the wrench slipped and I tumbled over and struck the concrete wall or something— I don't remember what it was, and broke my glasses and it hurt my eye a little bit. It didn't leave any permanent injury or anything, but for a little while—I was off about a week, I think, and I was going to tell him about that and he cut me off. I didn't figure it made any difference anyway.

"Q. Did you draw any compensation benefits for that? A. $25.00, I think. That is my recollection of it; I am sure it wasn't over that."

Mr. Ross testified further that he went to an eye doctor for treatment of his eye, and that the insurance company paid for the medical treatment.

Appellant contends that under the authority of the case of Texas Employers' Ins. Ass'n. v. Wade, supra, where a judgment for an employee for workmen's compensation benefits was reversed because a juror selected had remained silent upon similar questions being asked the jury panel, when in fact he had had several compensation claims. In the Wade case it was stipulated that such juror had had the claims, so there was no issue on that score under consideration. In this case it is a matter in dispute, or in any event is not admitted. We perceive a difference in having a claim, in having the right to assert a claim, or to make a claim, and having asserted or made a claim for compensation.

Appellant never showed through use of a release or compromise settlement agreement, or other form of evidence whatever, that the juror had made a claim, or that he was paid any compensation because of any claim. Appellant did not lay the proper predicate on his voir dire examination for the evidence introduced to display any disqualification of the juror, or he did not introduce sufficient evidence to disqualify him in view of what the voir dire examination consisted.

Furthermore, we believe that since the witness testified that he was cut off when he was trying to tell appellant's attorney about the incident in question when his glasses were broken, and since the record does not affirmatively demonstrate the contrary, it was in the discretion of the trial court to make the decision that the juror was not disqualified, which he did. His discretion will not be disturbed in the absence of abuse. There was no abuse. The point of error is overruled.

Appellant predicates another point of error upon the following statement made by the appellees' attorney when he first addressed the jury panel on voir dire examination, viz.:

"This is a workmen's compensation suit, growing out of the Texas Workmen's compensation law, brought by the Texas Employers Insurance, against Mrs. Wynema Noel, in which Mrs. Noel has filed a cross-action seeking benefits from the Texas Compensation Act against Texas Employers Insurance Association. Now, throughout the case, you will probably hear this thing in reverse. In other words, the lawyers are used to designating the Texas Employers as defendant. They filed this suit and we cross-acted so actually for all practical purposes Mrs. Noel is plaintiff in this law suit."

Appellant excepted at the time and on this appeal contends that this language disclosed to the jury panel, and also those of the panel finally selected, that it was a suit brought by the appellant to set aside an award made in behalf of appellees by the Industrial Accident Board, hence influencing the jury, because they were apprised of the Board's action and making them more inclined to find for appellees.

Appellant cites as his authorities the cases of Federal Underwriters Exchange v. Bickham, 1941, 138 Tex. 128, 157 S.W.2d 356, Commercial Standard Ins. Co. v. McGee, Tex.Civ.App.Dallas 1931, 40 S.W. 2d 1105, and Texas Employers' Ins. Ass'n v. Downing, Tex.Civ.App.Amarillo 1919, 218 S.W. 112, error refused.

Without elaboration upon the authorities cited, we believe that this matter

is settled by the case of Aultman v. Dallas Railway & Terminal Co., Tex.Sup.1953, 260 S.W.2d 596. Texas Rules of Civil Procedure, rule 434 is applicable. In order for the error in making any improper statement before the jury to amount to reversible error, it must appear that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. We do not mean to infer that there was anything wrong with the statement made. It is recognized that the average man understands that the plaintiff in any case is the person suing and the defendant is the person he sues, that the suer is the person whose name is in front of the word "versus" and the sued is the person whose name is behind. What we do mean to say is that even assuming that there exists a question as to whether the jury or some member thereof was erroneously informed by appellant that the Board had made an award which was in favor ·of the appellees, from which appellant was appealing, the appellant had the burden of showing that said attorney's act was reasonably calculated to cause and probably did cause the rendition of an erroneous verdict. Several of the jurors were interrogated upon the hearing of the motion for new trial. No question relating to this was ever asked of any of them. Assuming that the statement was erroneous, it was not shown that it conveyed the inhibited information to the jury, or that they so understood or so considered it, or that it had had any effect upon the verdict returned by it. Therefore, the point of error is overruled.

The appellees resorted to the Rules of Civil Procedure providing for requests for admissions of fact to be served upon the opposite party, once the suit was pending in the trial court. As part of the same, they asked certain questions, being numbered "5" and "6", to which the appellant filed answers, all as follows:

Question 5. " 'That cross-Plaintiff's employer had actual notice of said accidental injury within thirty days from the above stated date.' "

·'Answer: " 'To request No. 5, your plaintiff answers that the only knowledge it had of any injury suffered was a verbal report made ·by Ellis H. Noel within the thirty-day period.' "

Question 6. " .'That if the cross-plaintiff's employer did not have actual notice of said accidental injury then that said employer was notified within thirty days of the date above stated that said cross-plaintiff had sustained or was claiming to have sustained an accidental injury while in the course of his employment with said employer.' "

Answer: " 'To request No. 6, your plaintiff answers that it was notified by Mr. Noel as to his ·claim of having sustained an accidental injury in the course of his employment within thirty days of the date involved.' "

Appellant contends that since by their failure to deny under oath the pleadings of the appellees that notice of injury was given· within thirty days of the date of injury, they had admitted the requisite jurisdictional facts and ·therefore it was prejudicial for appellees to read the above questions and answers before the jury because it constituted incompetent proof of accidental injury erroneously admitted under· the guise of proving up a jurisdictional matter. Under the circumstances, appellant urges that· hearsay statements made by the deceased which were wholly self-serving were inserted into the evidence of ·such prejudicial nature that reversal of the judgment is required.

Without. citing authorities referred to by appellants, we recognize that the instruments filed with the Industrial Accident· Board, including the form by which Notice of Injury is there placed of record in exhibit ·form, may not be introduced into evidence upon the trial. of a workmen's compensation case as proof of the matters therein stated.

It is noted from the Statement of Facts that prior to the introduction of the foregoing requests for admission and the an-

swers given thereto, the appellees had introduced their res gestae evidence of the fact of injury to the deceased and the circumstances under which the injuries were received. If a proper predicate could be laid for the introduction of the questions and answers, such was done. The questions and answers demonstrate that the deceased did notify either his employer that he sustained the injuries within a thirty day period from the day they were sustained, or that the appellant itself was so notified by the deceased. The answers could be fairly construed either way or both ways. The worst construction of the answers would be that they were admissions on the part of appellant itself that it rather than the deceased's employer was on notice. However, all the parties brief the question as though the notice was to the employer rather than the insurer.

Appellees proceed on the premise that proof of a fact of injury is something distinct from proof of a fact that an injury was claimed to have occurred. They demonstrate the fact that had the deceased lived longer than he did without having ever notified his employer or any other person that he was injured or without having ever claimed in any conversation with his employer or other person that he had sustained any injury, this would have been a circumstance provable against him or his beneficiaries throwing doubt upon the validity of any claim presented. Certainly this would be possible and the weight of any such character of testimony would be for the jury. If this is so, why is it not likewise permissible to show that notice was given to the deceased's employer, who was not only a proper party to receive such notice but the natural person to whom such notice was given? It is true that the giving of notice of an injury is jurisdictional, but under certain circumstances the fact of its having been given may subserve other objectives.

■ We believe that the questions and answers are admissible in proof of the fact that the deceased reported his injury, as

the law requires that he do, to his employer or insurer, and the fact that such a report was made is admissible in evidence as a circumstance in aid of the proof of the fact of injury. It is a natural and usual thing for an injured employee to notify his employer of the fact of injury. The giving of notice lends more credence to the fact of injury. The converse would be true had appellant been in position to prove that the deceased made no report when it would have been natural and usual for him to do so. The weight of such evidence would be a matter for the jury, the fact being admissible. 17 Tex.Jur., p. 536–537, sec. 219, and cases there cited; Broomfield v. Texas General Indemnity Co., 5 Cir., 1953, 201 F.2d 746; Texas Employers' Ins. Ass'n v. Thames, Tex.Civ.App.Fort Worth, 1951, 236 S.W.2d 203, error refused.

The judgment is affirmed.